UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

Plaintiff,

v.

UNIPOINT TECHNOLOGIES, INC.,
d/b/a COMMUNICATIONS FIDELITY
a/k/a COMFI.COM

Defendant.

Civil No. 14-12020-LTS

ORDER ON MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT (DOC. NO. 24)

February 3, 2016

SOROKIN, J.

Plaintiff the United States of America ("the government") filed a Complaint against Defendant Unipoint Technologies Inc., d/b/a Communications Fidelity, a/k/a Comfi.com ("Unipoint"), to recover a monetary forfeiture the Federal Communications Commission ("FCC" or "The Commission") had assessed against Unipoint "for violations of the Communications Act of 1934 ('Act') and various regulations implementing that Act." Doc. No. 9 at 1. The government filed a Motion for Judgment on the Pleadings or, in the Alternative, Summary Judgment. Doc. No. 24. Unipoint opposed the motion. Doc. No. 29. The government responded to Unipoint's opposition, Doc. No. 39, the Court held a motion hearing, Doc. No. 32, and the government, with leave from the Court, submitted supplemental briefing on some issues raised at the motion hearing. Doc. No. 37; see Doc. No. 35 (granting leave to file the supplemental briefing). After careful consideration of the parties' briefs and arguments, the

Court enters judgment for the government on the question of liability, but finds a genuine issue of material fact as to the forfeiture amount. Accordingly, the motion is ALLOWED IN PART AND DENIED IN PART.[1]

## I. BACKGROUND

As the Court decides a motion for summary judgment, this factual recitation relies primarily on the government's "Statement of Material Facts of Record as to which the United States of America Contends There is No Genuine Issue to Be Tried," which the government incorporated into its Memorandum of Law in Support of Motion for Judgment on the Pleadings or, in the Alternative, for Summary Judgment. See Doc. No. 25 at 1-5. Further, as Unipoint is the non-moving party, the Court "view[s] the facts in the light most favorable to [Unipoint,] and draw[s] all reasonable inferences in [its] favor." Ray v. Ropes & Grap LLP, 799 F.3d 99, 112 (1st Cir. 2015).[2]

Unipoint, a Massachusetts-based corporation, sells prepaid calling cards to consumers. Doc. No. 25 ¶ 1. These cards can make both domestic and international calls. Id. ¶ 2. In order to use the cards, customers must create an electronic account with, and make payments to, Comfi.com, a website Unipoint runs. Id. Upon making payment, customers receive an email with a personal identification number (PIN), a telephone access number, and dialing instructions. Id. Unipoint offers both refillable and non-refillable cards. Id. Customers with refillable cards can reuse their PIN, or create a PIN-less card by registering a telephone number with Comfi.com

[1] Because both parties have presented evidence outside the pleadings, and the Court has not excluded that evidence, the Court "treat[s the motion] as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Further, to the extent that Unipoint moved for summary judgment when it said in its opposition that "this action should be dismissed," Doc. No. 29 at 9, that motion is DENIED.

[2] At the motion hearing, Unipoint asserted that it did not dispute any of the government's facts, except for its first fact, that Unipoint "provided telecommunications services."

and linking that number to their electronic account. Id. The calling cards Unipoint sells come from third parties—Unipoint does not create the cards themselves, and the cards are branded as coming from third parties. Doc. No. 30 ¶ 3.

On April 22, 2009, Unipoint applied to the FCC for authority under 47 U.S.C. § 214(a) to provide international telecommunications service. Doc. No. 25 ¶ 3. The FCC granted that authorization on May 8, 2009. Id. On August 17, 2009, Unipoint, with the assistance of counsel, see Doc. No. 12 at 6 n. 37, self-reported potentially unlawful conduct. Doc. No. 25 ¶ 4. The FCC's Enforcement Bureau investigated, and discovered that Unipoint may have provided international telecommunications services prior to receiving § 214 authorization. Id. The investigation revealed multiple additional purported violations, namely Unipoint's failure to: 1) timely file its 2007 Annual Worksheet, which would report its 2006 calendar year revenues; 2) timely make its 2007 and 2008 TRS Fund contributions; and 3) "timely file its 2008, 2009, and 2011 international telecommunications traffic reports (for calendar years 2007, 2008, and 2010, respectively). Id. ¶ 6.

On October 11, 2012, the FCC issued a Notice of Apparent Liability for Forfeiture ("NAL") against Unipoint. Id. ¶ 7; see Doc. No. 12 (The NAL). The NAL found that Unipoint, by the above-mentioned conduct, "had willfully or repeatedly violated Section 214(a) of the Act, as amended, and Sections 43.16, 52.17(b), 54.711, 63.18, and 64.604(c)(5)(iii)(A)-(B) of the Commission's rules." Doc. No. 25 ¶ 7. The NAL proposed a $179,000.00 forfeiture against Unipoint, broken down as follows: 1) $100,000 for unauthorized provision of international telecommunications service; 2) $50,000 for not timely filing a 2007 Annual Worksheet; 3) $20,000 for not making timely contributions to the TRS Fund in 2007 and 2008; and 4) $9,000

for not timely filing its 2008, 2009, and 2011 international telecommunications traffic reports. Id. ¶ 8; see Doc. No. 12 ¶ 23.

Unipoint appealed the NAL on January 10, 2013. Doc. No. 25 ¶ 9; see Doc. No. 25-3 (Unipoint's appeal). The appeal pushed three arguments: 1) that its violations were neither intentional nor willful; 2) that it was unable to pay a $179,000 forfeiture; and 3) that an alternative amount of $55,000 over thirty-six months was more appropriate.[3] Doc. No. 25 ¶ 9. Unipoint has never claimed that it took the actions that the FCC asserts Unipoint improperly failed to perform. See Doc. No. 25-3; Doc. No. 29. On February 11, 2014, the FCC issued its Forfeiture Order, affirming the NAL. Doc. No. 25 ¶ 10; see Doc. 12-1. On August 19, 2014, the government filed, pursuant to 47 U.S.C. § 504(a), the instant Amended Complaint to recover the forfeiture. Doc. No. 9.[4]

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the

[3] Because Unipoint only presses the first point in its brief, the Court does not address the other two arguments in this decision. See Doc. No. 29.

[4] The government filed its Initial Complaint on May 15, 2014. Doc. No. 1.

Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

Unipoint posits three broad reasons for why it should avoid liability for the $179,000 forfeiture order. First, it argues that as "simply a retailer of calling cards and not the provider of the services available through those cards," it is "not subject to Section 214 and the [FCC] regulations related thereto." Doc. No. 29 at 9. Second, it asserts that even if it acted unlawfully, its violations were neither willful nor repeated, rendering forfeiture inappropriate. Id. at 13-14. Finally, it contends that even if forfeiture is appropriate, the $179,000 assessment is "excessive, unjustified and should be reduced." Id. at 14. The Court addresses each of these arguments in turn. But before doing so, the Court describes the applicable law.

### A. Legal Framework

47 U.S.C. § 214, with some irrelevant exceptions, requires FCC authorization before a carrier can "undertake the construction of a new line or of an extension of any line, or . . . acquire or operate any line, or extension thereof." The Act defines a carrier, also known as a common carrier, as "any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy." 47 U.S.C. § 153(11). The FCC has interpreted the term common carrier to include parties who resell communications services. Regulatory Policies Concerning Resale and Shared Use of Common

Carrier Services and Facilities, 60 F.C.C.2d 261, 308 (1976); see also 47 C.F.R. § 63.18(e)(2) (describing procedure for resellers to comply with § 214's authorization requirement).

A "telecommunications carrier" is, with an irrelevant exception, a "provider of telecommunications services." 47 U.S.C. § 153(51). The Act in turn defines a "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(53). A telecommunication is a "transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(50). The FCC interprets the term "telecommunications service" to include prepaid calling cards. Regulation of Prepaid Calling Card Servs., 21 FCC Rcd. 7290, 7293 (2006) ("[P]repaid calling card services are telecommunications services and . . . their providers are subject to regulation as telecommunications carriers."). The Act specifically treats telecommunications carriers, with irrelevant exceptions, as common carriers "to the extent that [a telecommunications carrier] is engaged in providing telecommunications services." 47 U.S.C. § 153(51).

Certain carriers, such as international carriers, incur more obligations than just the § 214 authorization requirement. Carriers must provide specific information—including contact information, ownership information, and a certification of compliance with relevant regulations—with their § 214 applications. See 47 C.F.R. § 63.18.

Telecommunications carriers providing international telecommunications service must register with the FCC, which requires submitting an FCC Form 499-A. See 47 C.F.R. § 64.1195. Telecommunications carriers must also contribute to the FCC's Telecommunications Relay Services Fund ("TRSF"), in an amount based off their revenues from the prior year, to "support

numbering administration," 47 C.F.R. § 52.17(a), and telecommunications carriers must annually submit a Telecommunications Reporting Worksheet ("TRW") to determine the size of the contribution for a given year. 47 C.F.R. § 52.17(b); accord 47 C.F.R. § 52.32(b) (same); see also 47 C.F.R. § 54.711(a) (describing procedures for the FCC and telecommunications carriers to follow regarding TRWs); 47 C.F.R. § 64.604(c)(5)(iii)(A)-(B) (stating the contribution requirement, and describing the formula for calculating each carrier's contribution amount).[5] Finally, "each common carrier engaged in providing international telecommunications service" must "file[, by July 31 of each year,] a report with the Commission showing revenues, payouts, and traffic for such international telecommunications service . . . provided during the preceding calendar year." 47 C.F.R. § 43.62.[6]

Under 47 U.S.C. § 503(b)(1)(B), any entity which "willfully or repeatedly failed to comply with any of the provision of [the Act,] or of any rule, regulation, or order issued by the Commission under [the Act] . . . shall be liable to the United States for a forfeiture penalty." To recover such a forfeiture penalty, the United States must bring a civil suit "in the district through which the line or system of the carrier runs." 47 U.S.C. § 504(a). Such suits, per the Act, "shall be a trial de novo." Id.

B. Unipoint's Obligations

Unipoint's core argument against liability is that it falls outside § 214's orbit—both because it does not fit the statutory definition of a carrier, and because it is not constructing, extending, acquiring, or operating any channel of communication—and therefore had no obligations under § 214 and the related regulations (collectively "§ 214 obligations"). See Doc.

[5] Hereinafter, the Court refers to these four regulations collectively as "the TRW Regulations."
[6] When the parties briefed this case, this regulation was found at 47 C.F.R. § 43.61.

No. 29 at 5-9. This assertion relies on two key premises—first, that calling cards are not a telecommunications service; and second, that resellers are distinct from retailers.[7] If it is correct about either of these premises, the Court must deny the government's motion and issue judgment for Unipoint. If Unipoint is incorrect as to both, however, then it violated its § 214 obligations, as it never argues that it complied (even unnecessarily so) with those requirements. The Court accordingly addresses each premise.

1) Are Prepaid Calling Cards Telecommunications Services?

Although Unipoint does not acknowledge that the FCC has interpreted the term "telecommunications service" as including prepaid calling cards, it implicitly contends that such an assertion, and the consequent expansion of § 214 obligations to prepaid calling card providers, would be inappropriate. Therefore, the Court examines the propriety of that interpretation. Because "Congress has unambiguously vested the FCC with general authority to administer the Communications Act through rulemaking and adjudication, and the agency interpretation at issue was promulgated in the exercise of that authority," the Court analyzes the FCC's construction of the statute under the principles of so-called Chevron deference. City of Arlington v. FCC, 133 S. Ct. 1863, 1874 (2013).[8]

In Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842 (1984), the Supreme Court laid out a two-step inquiry for courts "review[ing] an agency's construction of the statute which it administers." "First, courts look to the statute to ascertain whether 'Congress

---

[7] Unipoint does not contest that the Commission can regulate resellers as carriers. See Doc. No. 29 at 7 (characterizing certain authorities the government cited in its brief as "involv[ing] a company reselling the actual telecommunications services . . . which would make them a 'carrier'").

[8] While § 504 calls for a de novo trial, that does not preclude the Court from deferring to FCC interpretations made outside the context of a § 503(b) forfeiture proceeding.

has directly spoken to the precise question at issue.'" Santana v. Holder, 731 F.3d 50, 55 (1st Cir. 2013) (quoting Chevron, 467 U.S. at 842). "If the statute is clear in its meaning, [courts] must 'give effect to the unambiguously expressed intent of Congress.'" Id. (quoting Chevron, 467 U.S. at 842-43). In determining if Congress has spoken on the relevant question, courts use all appropriate tools of statutory interpretation. See id. Only if Congress's intent remains unclear after deploying these tools does the Court move to "step two." Id. "At Chevron's second step, the inquiry focuses on 'whether the agency's answer is based on a permissible construction of the statute.'" Id. (quoting Chevron, 467 U.S. at 843) (emphasis added). The Court defers to an agency's permissible construction "unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" Saysana v. Gillen, 590 F.3d 7, 13 (1st Cir. 2009) (quoting Chevron, 467 U.S. at 844).

i) Step One

In undertaking the Step One inquiry, the Court follows "settled principles of statutory construction," and "first look[s] to whether the statutory text is plain and unambiguous." Hernandez-Miranda v. Empresas Diaz Masso, Inc., 651 F.3d 167, 171 (1st Cir. 2011). The analysis begins with 47 U.S.C § 153(53), which defines "telecommunications services" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(50) in turn defines telecommunications as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." Unipoint clearly sells directly to the public, for a fee, prepaid calling cards. Thus, if a prepaid calling card is a means of telecommunication, then Unipoint provides telecommunications services.

Nothing in the Communications Act addresses this particular question. Neither party points to any part of the statute explicitly classifying prepaid calling cards either as a telecommunications service, or as not a telecommunications service. Nor does the Act provide other textual indicators of intent. For example, had Congress included a list of "telecommunications service," and excluded prepaid calling cards from that list, such exclusion might prompt the inference that Congress intended to treat prepaid calling cards as different from telecommunications services. See Diaz-Carrasquillo v. Garcia-Padilla, 750 F.3d 7, 11 (1st Cir. 2014). Nor has either party shown that the Court should harmonize its reading of this statute with another statute, and that such synchronization compels a particular construction. See Rathbun v. Autozone Inc., 361 F.3d 62, 68 (1st Cir. 2004). Because nothing "either mandates or excludes either side's view, [the Court] turn[s] to step two." Craker v. Drug Enforcement Admin., 714 F.3d 17, 27 (1st Cir. 2015).

ii) Step Two

To survive Step Two of the Chevron analysis, the FCC's interpretation must simply be reasonable. The FCC has met this burden. In deciding that prepaid calling cards constitute a telecommunications service, the FCC has observed that prepaid calling cards "allow[] the user, by choosing the appropriate entry from the menu, to have the calling card provider transmit 'between and among points specified by the user . . . information of the user's choosing, without change in the form or content of the information as sent and received.'" Regulation of Prepaid Calling Card Servs., 21 FCC Rcd. at 7294 (quoting 47 U.S.C. § 153(43)).[9] As the parties acknowledge, consumers use calling cards, in lieu of using a traditional phone company's service, to make telephone calls to other individuals, and convey the information of their

[9] This definition is now found at 47 U.S.C. § 153(50).

conversations through that medium. See id. at 7290 ("Prepaid calling cards provide consumers the ability to place long-distance toll calls without presubscribing to an interexchange carrier (IXC) or using a credit card."). Given the similarity between using calling cards to make telephone calls and using a subscription to an exchange carrier to make those same calls, the FCC made the seemingly-reasonable decision to treat the two methods similarly.

Although it does not phrase this as a Step Two argument, Unipoint asserts that "it is absurd to argue that every shop in the United States that sells calling cards must first receive the Commission's authorization pursuant to Section 214." Doc. No. 29 at 7-8; see Boivin v. Black, 225 F.3d 36, 41 (1st Cir. 2000) ("[T]he unambiguous text of a statute may yield if its application tends to produce absurd results."). The absurdity exception has no application to the present case. Its own bare assertions aside, Unipoint is not equivalent to a small local convenience store selling calling cards. The undisputed facts show that Unipoint provides not only the PIN and access number to consumers, but also provides the infrastructure for continued use of the prepaid cards. Consumers refill their cards on a website Unipoint hosts. And consumers pay Comfi.com, not the original providers, when they refill these cards. This heightened involvement factually distinguishes Unipoint from the corner store it seeks to invoke to avoid liability.

Additionally, the FCC itself explicitly recognizes these factual distinctions. In its instructions on filling out FCC Form 499-A, the FCC directs that "[c]ompanies that do not assign PINs but rather sell cards created by others are marketing agents and do not file." Telecommunications Reporting Worksheet, FCC Form 499-A (2009): Instructions for Completing the Worksheet for Filing Contributions to Telecommunications Relay Service, Universal Service, Number Administration, and Local Number Portability Support Mechanisms

at 14, available at https://transition.fcc.gov/Forms/Form499-A/499a-2009.pdf. This distinction underscores how under the FCC's construction, a "corner store" would not fall under the relevant requirements.

2) Distinction Between Resellers and Retailers

As mentioned above, Unipoint sells calling cards, a telecommunications service. Accordingly, it is a telecommunications carrier. See 47 USC § 153(51) (defining "telecommunications carriers," with irrelevant exceptions, as "any provider of telecommunications services"). Because a telecommunications carrier is "treated as a common carrier . . . to the extent that it is engaged in providing telecommunications services," and because resellers of communications services are treated as common carriers, Regulatory Policies Concerning Resale and Shared Use of Common Carrier Servs. and Facilities, 60 FCC 2d 261, 308 (1976); see also Doc. No. 29 at 8 (acknowledging that "resellers of services may be subject to the Act"), if Unipoint resells international calling cards, it must fulfill the obligations for international carriers under § 214 and the accompanying regulations. See Start Wireless Grp., 27 FCC Rcd. at 354 ("[B]ecause Page Plus is a common carrier reseller of international telecommunications services, it is required, pursuant to Section 214, to obtain Commission authorization before providing international telecommunications services."); see also 47 CFR § 63.18(e)(2) (listing specific procedures for entities "applying for authority to resell the international services of authorized common carriers") (emphasis added).

Unipoint tries to avoid these obligations by claiming that it does not resell, but rather retails, prepaid calling cards. See, e.g., Doc. No. 29 at 3. However, the same reasons keeping Unipoint from being an analog to a corner store, which mimic the distinction the FCC itself draws between resellers and marketing agents, differentiate Unipoint from a mere retailer. Its

heightened involvement in, and extensive infrastructure pertaining to, the prepaid calling cards, even after purchase, does not mimic the one-off dynamic that calling-card purchasers at small merchants offer. Unipoint is thus not a retailer of calling cards. Accordingly, the Court looks to the undisputed factual record to see if Unipoint fits the definition of a reseller.

The FCC defines resale as "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public (with or without 'adding value') for profit." Regulatory Policies, 60 FCC 2d at 271. Unipoint does not assert any impropriety with that definition.

Unipoint acknowledges "reoffer[ing]" prepaid calling cards "to the public (with or without 'adding value') for profit." Id.; see Doc. No. 29 at 2 ("Defendant's activities are generally limited to selling the calling cards to the customer . . . ."). Further, as mentioned above, prepaid calling cards are a communications service. Therefore, if Unipoint "subscribes to the communications services and facilities of another," then it is a reseller, and is subject to the disputed obligations.

Unipoint asserts that it "does not itself create or issue any of the calling cards." Doc. No. 29 at 2. This, however, does not answer the question of whether or not it subscribes to the calling cards when it obtains them from other carriers, before subsequently selling them to consumers. Although neither party offers a definition of "subscribe," the Court notes that the Fifth Circuit very recently canvassed a variety of definitions for the word "subscriber," and noted that they all shared a "common thread" in that they all "involve[d] some type of commitment, relationship, or association (financial or otherwise) between a person and an entity." Ellis v.

Cartoon Network, Inc., 803 F.3d 1251, 1256 (5th Cir. 2015).[10] Unipoint clearly has a relationship or association with the companies from which it purchases the calling cards—Unipoint pays those companies money, and in return, those companies provide Unipoint with prepaid calling cards, while maintaining an ongoing relationship with Unipoint so that customers can refill their cards with those companies through Unipoint's infrastructure. Unipoint thus subscribes to the communications services of another, and reoffers that communications service (the prepaid calling cards, including ones with international service) to the public. Unipoint is therefore a reseller of a communications service, and thus falls under § 214's obligations.

* * *

Because Unipoint is a common carrier offering a telecommunications service, it incurred the § 214 obligations. Unipoint's only defense to liability is that the regulations did not apply to it. Because this assertion is incorrect, Unipoint faces liability on all four counts.

C. Willfulness and Repeatedness of Unipoint's Violations

In addition to arguing that it did not face the § 214 obligations, Unipoint argued that, even if it did, any violation was neither willful nor repeated. The government can only impose a forfeiture penalty for violating these obligations if the violations were willful or repeated—either one suffices. 47 USC § 503(b). Unipoint argues that its violations were unwillful because it voluntarily self-disclosed and "took all necessary action in order to come into compliance with the Act." Doc. No. 29 at 13. It claims that the violations were not repeated because "[s]oon after" the self-disclosure, Unipoint "promptly remedied all past alleged violations and has since been in full compliance with the Act." Id. at 14. Both arguments are unavailing.

---

[10] Although Ellis dealt with the definition of "subscriber" in the context of the Video Privacy Protection Act, Ellis, 803 F.3d at 1252, no party has suggested that the FCC used the word in any manner outside its ordinary meaning.

47 USC § 312(f)(1) defines, for purposes of that section, willful to mean "the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this chapter or any rule or regulation of the Commission authorized by this Chapter or by a treaty ratified by the United States." 47 USC § 312(f)(2) defines repeated as "the commission or omission of such act more than once or, if such commission or omission is continuous, for more than one day." The FCC applies these same definitions to forfeiture penalties imposed under § 503(b). See, e.g., Daniel R. Hicks, 30 FCC Rcd. 8437, 8437 n. 7 (2015); accord United States v. Baxter, 841 F. Supp. 2d 378, 391 (D. Me. 2012). As far as the Court can tell, the FCC has only discussed the terms' identical constructions in § 503(b) forfeiture cases. Accordingly, the Court must review that determination de novo. 47 USC § 504.

Under even de novo review, however, the FCC's interpretation is correct. First, Unipoint has not raised any argument about why the Court should define willfully or repeatedly differently between the sections. Second, legislative history indicates that Congress desired concordant meanings between §§ 312(f) and 503(b). H.R. Rep. No. 97-765, at 50-51 (1982), reprinted in 1982 U.S.C.C.A.N. 2261, 2294-95 ("This provision defines the terms 'willful' and 'repeated' for purposes of Section 312, and for any other relevant sections of the Act (e.g., Section 503)"). Finally, although § 312(f) states that the definitions found there are "[f]or purposes of th[at] section," nothing in the statute mandates using those definitions in that section exclusively. Consequently, the Court interprets the words "willfully" and "repeatedly," as they appear in § 503(b), as having the same meaning they have in § 312(f). See Baxter, 841 F. Supp. 2d at 391.

Unipoint repeatedly violated every requirement in question. Unipoint does not dispute that it sold prepaid calling cards, including international ones, for approximately three years before receiving the requisite authorization under § 214 and 47 CFR § 63.18. As this failure to

obtain authorization lasted for more than one day, it was repeated. Therefore, judgment for the government on Count I is appropriate.

Unipoint also does not deny that it failed to file a TRW until September 22, 2009. See Doc. No. 12 ¶ 10. As a carrier which provided telecommunications services for at least three years, Unipoint needed to file a TRW no later than 2007 (the first year it did so), and do so again in 2008 and 2009. As Unipoint failed entirely to submit an annual TRW in 2007 and 2008, it repeatedly violated 47 C.F.R §§ 52.17(b), 52.32(b), 54.711, and 64.604(c)(5)(iii)(B). Accordingly, judgment for the government on Count II is appropriate.

Further, Unipoint does not dispute that it failed to make annual contributions to the TRS Fund in both 2007 and 2008, and that such contributions are due each year by the end of July, as 47 C.F.R § 64.604(c)(5)(iii)(A) requires. As Unipoint did not make such contributions until October 20, 2009, see Doc. No. 12 ¶ 10, it repeatedly violated 47 C.F.R § 64.604(c)(5)(iii)(A), as the payments for both years were tardy. Thus, judgment for the government on Count III is appropriate.

Finally, Unipoint does not contest that it failed to file a timely traffic and revenue report for the years 2007, 2008, and 2010, as 47 CFR § 43.62 mandates. Specifically, it concedes that it filed on March 31, 2010 the reports due on July 31, 2008 and July 31, 2009. See Doc. No. 12 ¶ 10. These filing were approximately twenty and eight months late, respectively. Further, Unipoint concedes that it did not file its 2010 report until August 18, 2011, over two weeks too late. Id. As both filings were late, the failure to timely file was repeated. Therefore, judgment for the government on Count IV is appropriate.

D. Appropriateness of Forfeiture Amount

Finally, Unipoint asserts that even if liable, the FCC's forfeiture "is excessive, unjustified and should be reduced." Doc. No. 29 at 14. Given that Unipoint receives a trial de novo, 47 U.S.C. § 504(a), the Court must find that, as a matter of law, the FCC correctly determined the fine amount. The Act calls for consideration of "the nature, circumstances, extent, and gravity of the violation, and with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." 47 U.S.C. § 503(b)(2)(E).[11]

Drawing all factual inferences in Unipoint's favor, the Court finds a genuine dispute about whether $179,000 is the proper fine amount. A rational factfinder could very heavily weigh Unipoint's decision to approach the FCC, and determine that this good-faith overture more than outweighs the violations' repeated nature. Similarly, a factfinder could rationally emphasize Unipoint's lack of a prior history of FCC violations in balancing the relevant criteria, and thereby deem the FCC's forfeiture amount too high. Given these disputes, the Court DENIES the government's motion as to the forfeiture amount.

## IV. CONCLUSION

For the reasons stated above, the government's Motion for Judgment on the Pleadings or, in the Alternative, Summary Judgment, Doc. No. 24, is ALLOWED IN PART AND DENIED IN PART. The parties shall file a joint status report within fourteen days addressing: a) the expected duration of the trial; b) whether both parties consent to the jurisdiction of the assigned magistrate judge; and c) whether both parties request a referral to the Court's mediation program.

---

[11] The FCC's supplemental briefing quotes language from cases discussing the deference due agencies to suggest that Chevron deference applies to the FCC's determination of the proper fine amount. See Doc. No. 37 at 6-7. However, those cases deal with deference to an agency's legal conclusions. The fine amount, by contrast, is a purely factual question. This renders, even putting aside § 504(a)'s call for de novo trials, those cases inapposite.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge